## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 31 2020, 9:52 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Benjamin L. Niehoff
Slotegraaf Niehoff, P.C.
Bloomington, Indiana

APPELLEE PRO SE

Michelle Thompson
Bedford, Indiana

# I N   T H E
# COURT OF APPEALS OF INDIANA

Derek Thompson,

*Appellant*,

v.

Michelle Thompson,

*Appellee*.

March 31, 2020

Court of Appeals Case No.
19A-DR-2400

Appeal from the Lawrence Circuit Court

The Honorable Nathan G. Nikirk, Judge Pro Tem

Trial Court Cause No.
47C01-1308-DR-1049

**Brown, Judge.**

[1]     Derek Thompson ("Father") appeals from the trial court's order modifying his parenting time and child support obligation. We affirm.

*Facts and Procedural History*

[2]     Father and Michelle Thompson ("Mother") were married in January 2010 and have one child, S., born in 2010, together. Father has two other children, including J., born in 2005. On December 11, 2013, the trial court issued a decree of marriage dissolution which incorporated the parties' settlement agreement. The agreement provided Mother with primary physical custody of S. and stated:

> The parties shall generally follow the Indiana Parenting Time Guidelines, with Wife as primary physical custodian, and any additional parenting time for Father as agreed between them. However, any time [S.] is with Father overnight, his son [J.] shall not stay with Father and shall instead stay with his paternal grandmother . . . .

Appellant's Appendix Volume II at 25. The agreement also set Father's weekly support obligation at $143 and incorporated a child support worksheet indicating Father's weekly gross income was $880.

[3]     On December 19, 2013, Mother filed an emergency motion to modify parenting time. On July 8, 2014, the court issued an order stating that it had held a review hearing on Mother's motion, that DCS "unsubstantiated the allegations alleged by [Mother] in this matter," and that "the court does have concerns about [Father] taking his duty to supervise [S.] around [J.] seriously after his disclosure in court that 'I did things with my cousins what's the big deal.'" *Id*.

at 36. The court ordered that Father have parenting time as set forth in the dissolution decree "with the additional stipulation that [Father] shall not at any time leave [S.] alone with [J.] and that leaving [S.] alone with [J.] shall be cause for [Mother] to file for an Emergency Order to stop visitation until a hearing can be held." *Id.*

[4] On November 26, 2018, Mother, *pro se*, filed a motion for an emergency order to stop visitation alleging Father had "failed to supervise [S.] during visiting hours with half-brother" and had not been following the court's December 11, 2013, and July 8, 2014 orders. *Id.* at 38. On December 3, 2018, Father filed a response which referred to the court's December 2013 order that J. was to spend the night at his grandmother's home if S. was having an overnight visit with him. The response stated the parties had agreed, approximately four and one-half years earlier, that "this was unnecessary and there was no further reason to conduct the visits in this manner" and that "the only change in circumstance is that Father was recently married in March of this year, and now has a new Wife [S.T. ("Stepmother")] and her [two] daughters . . . living with him and his [two] sons . . . which may cause some jealously [sic] causing [Mother] to attempt to keep [S.] away from his family." *Id.* at 47.

[5] On December 12, 2018, the court held a hearing at which Mother appeared without counsel and Father appeared with counsel. The court admitted text messages between the parties showing Mother sent a message to Father stating that she wished to confirm that J. stayed with his grandmother when S. stayed with Father all night, "[a]nd when he is there with her during the day you are

watching her at all times," and "[s]he is not to be left alone with him at all." Exhibit A. The exhibit shows Father sent a reply to Mother stating: "I'm not doing that we haven't done that for years and you gave me the ok to do that so if that's a problem then she can go to your house at bedtime." *Id.* Mother's response stated: "I never gave you the okay that she can be there all night with [J.]. . . She's allowed to be with him during the day as long as you supervise and never alone. But overnights he is not supposed to be there if she is there." *Id.* The messages also show Mother indicated she would be calling her attorney, and Father sent a reply stating: "Call em[.] We can go back to court if you want to I'm fine with that." *Id.* Mother testified J. was arrested, Father did not tell her what had happened, S. had come home crying and told her about it, that was when she spoke with Stepmother about what had happened and the court order, and then she exchanged the text messages with Father on November 21, 2018.

[6] The court also admitted a document titled "Evidence: Cover sheet: Safety Plans," which stated in part: "4/21/2010: . . . 1st safety plan to supervise [J.] at all times around children," "2nd safety plan: Guardian of Litem: Do not [sic] [J.] alone with any child without adult supervision," "3rd safety plan made by DCS: 4/29/13: The children are no longer to be unsupervised in light of the situation," "Signed DCS form from [Father] on 4/29/13," "1/29/2014: [Father] admitted to DCS that [J.] admitted to touching [S.] on her privates a year before this report," and "1/29/14: 4th safety plan made By DCS. A family support plan was signed by [Father] regarding appropriate supervision of

the children at all times." Exhibit B. Another document included in the exhibit dated January 29, 2014, summarized a family case manager's interviews and stated, in the conclusion section, that "there is a lack of preponderance of evidence to support the allegation is true," the allegation of sexual abuse was unsubstantiated, Father "agrees to appropriately supervise the children at all times," and "[t]here is a court order in place stating that [ ][1] have [sic] to stay elsewhere when [ ][2] stays with [Father] overnight." *Id.*

[7] The court stated it was not going to stop visitation and gave a direct order that its orders be followed until they were modified, Father's counsel asked to set a hearing, and the court noted Mother needed time to hire an attorney and set another hearing.

[8] On January 18, 2019, Mother filed: a Verified Motion for Contempt and Request for Attorney Fees alleging Father had not been supervising S. when J. is around, did not make J. leave the residence while S. was sleeping, and had not carried insurance on S. as required; a Verified Motion to Modify Parenting Time Order seeking to modify Father's parenting time "so that [J.] shall not be present during any time [S.] is with her father"; and a Verified Motion to Modify Child Support. Appellant's Appendix Volume II at 53.

---

[1] Brackets here indicated text which was redacted in the exhibit.

[2] Brackets here indicated text which was redacted in the exhibit.

[9]     On August 28, 2019, it held a hearing at which the court heard testimony from Mother, Father, and Stepmother.  Mother testified there had been allegations that J. had touched S. inappropriately in the past which resulted in the restrictions set by the court.  She testified that Father wanted extra visitation during Thanksgiving, she sent a text message to him saying she was fine with the extra visitation as long as the court's order was followed, and Father replied "I've not followed the Court order in years."  Transcript Volume II at 17.  She testified she did not know he had not been following the court's orders that J. not be present overnight while S. was present.  She testified she told Father she would have to go back to court to make sure the orders were followed, he replied "[g]o ahead and contact the Courts," and she filed something on her own the next day.  *Id.* at 18.  She indicated she is fearful S. will be hurt, especially if she not supervised.  She indicated Father said that he will not follow the court's orders, she did not want S. around J. because she did not feel like they were being watched, and she did not want S. staying all night if J. was present.  She indicated she was okay with Father having overnights if J. was not present.  On cross-examination, Mother indicated she had learned or suspected J. had abused S. and DCS investigated and came back with a finding of unsubstantiated.  She further indicated that "[t]hey put in a family care plan that [Father] signed that at no times, any of the children be left unattended." *Id.* at 40.  When asked if S. had ever again reported that J. has done anything towards her during the prior six years when S. had overnights with J. present, Mother replied that she had not and that she just says she is scared.

[10] Stepmother testified she had been married to Father for about one and one-half years, she has two daughters, and there were a number of times over the years when S. spent the night and J. also spent the night at the home. When asked if there were times she felt unsafe in the home, she replied affirmatively and indicated there were times J. did not care for her. She testified that J. shoved her one time, S. was at the home that weekend, she called the police, and J. went to a juvenile facility for two nights and was placed on probation. She indicated she and Father were separated for approximately three months and she had moved back into the home five weeks earlier. On cross-examination, Stepmother indicated that she, Father, and the other children would be in the house when S. and J. were in the house and that she cleaned houses and was at the home pretty often. When asked if she and Father were absent from the home while J. and S. were in the home, she responded in the negative and that usually S. stayed with her if she went somewhere. She indicated that she got along with S. very well from the beginning and S. related to her daughters very well. She indicated she did not care for J. much at first and he would push boundaries with her, J. had become a totally different child, things had changed since he was placed on probation and received lots of therapy, and she is not afraid of him anymore. When asked if S. complained about anybody being inappropriate towards her, Stepmother answered in the negative and that S. always had a good time at the house. She indicated S. and J. get along fine.

[11] Mother was recalled and testified that, when S. learns she is going to Father's home, she cries and becomes very anxious. She testified that S. would ask if

Stepmother's daughters would be there, if she said yes S. seemed okay, and if she said no S. cried and did not want to go.

[12] Father testified J. has had an attitude problem at times in the past, there was an allegation against J. which DCS returned as unsubstantiated, and J. had an argument with Stepmother and pushed her down on the floor. He testified J. had therapy, is a totally different child, and is still in therapy. When asked if J. and S. are ever left alone together in the house, night or day, he answered in the negative and stated that none of the children are left alone in the house, especially at night. He indicated that Mother and Stepmother had an argument a short time before Mother's filings. He also testified that, about five or six months after his divorce from Mother, he informed her that S. and J. were going to stay at his house at the same time, it was too difficult to find a place for J. every other weekend and it was his home, Mother said she would allow it as long as he promised to keep a good eye on S., he had been allowing S. to stay overnight while J. was present for five or six years, and Mother never objected until her argument with Stepmother.

[13] Mother was recalled again and testified that she never had a conversation with Father about allowing J. to stay the night, they never had the discussion, she fought very hard at every court hearing to make sure that did not happen, and her position has never changed.

[14] On September 12, 2019, the court issued an order on the pending motions. With respect to parenting time, the court found in part that there was a long,

contentious history involving J. and whether J. will have contact with S.; Mother had consistently argued to limit J.'s contact with S.; a DCS report indicated that Father admitted that J. "had admitted to touching [S.] on the privates"; the court previously expressed concerns about Father taking his duty to supervise S. around J. seriously; the court's concerns have been realized as Father admitted that he stopped following the court's orders years ago; Father had failed to supervise S. and J. as required by its order and such failure is a change in circumstances warranting a modification in parenting time; it is in S.'s best interest that J. is not present in the home during her overnight parenting time; and Father refuses to accept this fact and refuses to follow the court's orders. Appellant's Appendix Volume II at 15. The court found it is in S.'s best interest to have no overnights with Father at this time, that Father's parenting time shall be modified to every other weekend on Saturday and Sunday from 9:00 a.m. to 9:00 p.m., and that Father shall have every Wednesday from 5:00 p.m. to 8:00 p.m. The court also ordered: "Father must be present with [S.] at all times during the Court ordered parenting time. [S.] is not to be left alone at any time with [J.]. If Father is not available to supervise the Court ordered parenting time the parenting time shall not take place and shall lapse." Appellant's Appendix Volume II at 16.

[15] With respect to child support, the court noted that there was testimony Father worked overtime most Saturdays at time and a half, he would make forty-five dollars an hour for eight hours on Saturday for an additional $360 per week, and based on a forty-eight-hour week, Father makes $1,561 per week. It

ordered Father to pay child support of $241 per week. As for contempt, the court found father in contempt, noting that Father admitted he had not followed the court's previous orders concerning S. and J.'s interactions and admitted he had not maintained S. on his medical, dental, and vision insurance and ordered Father to pay $500 in attorney fees.

## *Discussion*

### I.

Father first claims the trial court erred in ordering that his parenting time can occur only when he is physically present. He argues there was always an adult present when the children were present, the court's order effectively prevents Stepmother or anyone else from caring for S. for any period if he is not physically present, such a restriction is not supported by the evidence, and there was no allegation that Stepmother was not an appropriate caregiver. He also argues there was no report that J. has done anything to S. in the last six years.

Mother maintains the record is replete with evidence which supports the trial court's decision. She argues that several court orders were in place to protect S. and that Father testified that he had been having S. sleep in the same house with J. for six years. She argues Stepmother has been scared of J., J. was arrested for assaulting Stepmother, and S. was in the home at the time of the assault. She contends the parenting time restriction is needed due to Father violating the court's orders for six years.

[18]     The Indiana Supreme Court has expressed a "preference for granting latitude and deference to our trial judges in family law matters." *In re Marriage of Richardson*, 622 N.E.2d 178, 178 (Ind. 1993). Appellate deference to the determinations of trial court judges, especially in domestic relations matters, is warranted because of their unique, direct interactions with the parties face-to-face, often over an extended period of time. *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011). Thus enabled to assess credibility and character through both factual testimony and intuitive discernment, trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children. *Id.*

[19]     When a trial court has made findings of fact, we apply the following two-step standard of review: whether the evidence supports the findings of fact, and whether the findings of fact support the court's conclusions. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). To determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. *Id.*

[20]     A decision about parenting time requires that foremost consideration be given to the best interests of the child. *Perkinson v. Perkinson*, 989 N.E.2d 758, 761 (Ind. 2013); *see also* Ind. Code § 31-17-4-2 ("The court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child. However, the court shall not restrict a parent's parenting time rights unless the court finds that the parenting time might endanger the child's physical health or significantly impair the child's emotional

development."). Parenting time decisions are reviewed for an abuse of discretion. *Perkinson*, 989 N.E.2d at 761. We will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment. *Id*. Indiana courts may deviate from the Parenting Time Guidelines upon making a written explanation indicating why the deviation is necessary or appropriate in the case. *See* Preamble, Ind. Parenting Time Guidelines.

[21] The trial court issued the dissolution decree in December 2013 incorporating the parties' settlement agreement, and the agreement provided that, any time S. was with Father overnight, J. would not stay with Father. The parties do not dispute the terms of their settlement agreement. The court also issued an order in July 2014 ordering that Father have parenting time as set forth in the dissolution decree "with the additional stipulation that [Father] shall not at any time leave [S.] alone with [J.] and that leaving [S.] alone with [J.] shall be cause for [Mother] to file for an Emergency Order to stop visitation until a hearing can be held." Appellant's Appendix Volume II at 36. The court entered findings regarding the long, contentious history involving J. and whether J. will have contact with S., its concerns about Father taking his duty to supervise S. around J. seriously, Father's admission that he stopped following the court orders years earlier, and his refusal to follow the court's orders. It also found it is in S.'s best interest to have no overnights with Father at this time and ordered that Father must be present with S. at all times during his parenting time. The testimony presented at the hearing provides support for the court's findings and order. Under these circumstances, and keeping in mind our deference to trial

judges in family law matters, we cannot say we are left with a firm conviction a mistake has been made or that the trial court's decision is clearly erroneous.

## II.

[22] Father next claims the trial court erred in modifying his weekly child support obligation. We place a strong emphasis on trial court discretion in determining child support obligations and will set aside child support modifications only where they are clearly erroneous. *Lea v. Lea*, 691 N.E.2d 1214, 1217 (Ind. 1998). Findings are clearly erroneous when the record contains no facts to support them either directly or by inference. *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). Ind. Code § 31-16-8-1 governs modification of child support orders and provides in part:

(a) Provisions of an order with respect to child support . . . may be modified or revoked.

(b) Except as provided in section 2 of this chapter, modification may be made only:

(1) upon a showing of changed circumstances so substantial and continuing as to make the terms unreasonable; or

(2) upon a showing that:

(A) a party has been ordered to pay an amount in child support that differs by more than twenty percent (20%) from the amount that would be ordered by applying the child support guidelines; and

(B) the order requested to be modified or revoked was issued at least twelve (12) months before the petition requesting modification was filed.

[23]     Father argues the court erred in determining his income with respect to his overtime compensation. He argues the evidence does not support a finding he works eight hours every Saturday throughout the year and that he testified only that he worked a lot of Saturdays in the summer months. Mother maintains the court did not err in setting Father's weekly gross income and argues Father did not provide income verification, he testified that he works a lot of Saturdays, there are weekdays Father works more than eight hours, and the support calculation does not include any profits from Father's farming activities.

[24]     Indiana Child Support Guideline 3A(1) states that weekly gross income includes salaries, wages, and overtime. With respect to overtime and irregular income, the Commentary to Guideline 3A provides that "[t]here are numerous forms of income that are irregular or nonguaranteed, which cause difficulty in accurately determining the gross income of a party" and that examples include overtime and voluntary extra work and extra hours. Subsection 2(b) to Commentary to Guideline 3A.

[25]     The record reveals that Father worked for a pipeline company. When asked if Father "works a lot of hours during the week," Stepmother answered "[y]es, and even some weekends." Transcript Volume II at 53. She testified "his schedule is random, like it depends every night," "[t]here's been nights where he's got home at 8:30," and "[t]here's even been nights where he's got home at 8:30 and then he's called at 11:30 for an emergency and didn't come home until 2:00 a.m." *Id.* at 53-54. When asked how often Father works weekend days, she answered "[s]ummertime, pretty often and even – I don't know. It's pretty

often – a couple weekends a month," and when asked if he works both or just one of the weekend days, she replied "[u]sually just Saturday." *Id*. at 54-55. When asked to describe his schedule, Father testified: "Well, it's kind of – the evenings it's hard to tell usually. I usually get home in between 5:00 and 7:00 on most average evenings. During the summer months, I work a lot of Saturdays. But as fall approaches, that usually slows down some. Winter months, pretty consistent eight hour days." *Id*. at 67. He indicated that his hourly rate was $30.03. The trial court set Father's weekly gross income for purposes of calculating his child support obligation at $1,561 based on Father working forty-eight hours a week. Based upon the record, including Father's testimony that he worked a lot of Saturdays in the summer months and was usually home between 5:00 and 7:00 on most average evenings as well as Stepmother's testimony that he works a lot of hours during the week and is called for emergency work at times, we cannot say the court's child support determination is clearly erroneous.

[26] For the foregoing reasons, we affirm the trial court.

[27] Affirmed.

Baker, J., and Riley, J., concur.